IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VERONICA GUTIERREZ, *et al.*,

    Plaintiffs,

v.

WELLS FARGO & COMPANY, *et al.,*

    Defendants.

No. C 07-05923 WHA

**ORDER RE MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this certified consumer class action, defendant Wells Fargo Bank, N.A. moves for summary judgment. For the reasons stated below, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

This suit challenges certain overdraft charge practices by Wells Fargo Bank, N.A. The three named class representatives assert six claims: (1) violation of the Consumer Legal Remedies Act, California Civil Code Section 1750; (2) violation of the Unfair Business Practices Act, California Business and Professions Code Section 17200; (3) violation of the Unfair Business Practices Act, California Business and Professions Code Section 17500; (4) fraud; (5) negligent misrepresentation; and (6) conversion.

Defendant Wells Fargo Bank, N.A., is one of the nation's largest banks and financial institutions. In conjunction with its banking services, Wells Fargo issues debit cards to

customers who have opened a bank account. Wells Fargo customers receive a monthly account statement that includes information regarding the transactions that took place during the month. Customers who sign up for online banking, however, have access to more up-to-date information regarding their accounts. These customers can access their account online at any time to view their most recent account activity, pending transactions, and Wells Fargo's calculation of the "available balance" in the account.

An "overdraft" occurs when a transaction is posted for which there is insufficient money in the account. If the bank determines that an overdraft has occurred, it must first decide whether or not to pay the item or return it for insufficient funds. If the bank decides to pay the overdraft transaction, an overdraft fee is typically assessed. (If the item is rejected, then a separate penalty called a non-sufficient funds (NSF) fee is imposed.) Such a fee is charged each time a transaction is posted that results in an overdraft. A customer may link a separate account, such as a savings account, to provide for overdraft protection when the customer's main checking account does not have sufficient funds to settle the transaction.

When an account is opened with Wells Fargo, the customer receives a copy of a consumer account agreement. That agreement contains the following language (Zimmerman Exh. A at 23):

> **Overdraft and Insufficient Funds**. The Bank may, as its option, pay or refuse to pay any Item if it would create an overdraft on your Account, without regard to whether the Bank may have previously established a pattern of honoring or dishonoring such an Item. The Bank may take the following actions if the Bank receives an Item (including an ATM or POS Item) drawn against your Account and there are insufficient available funds in your Account to cover the Item without prior notice to you:
>
> **Cover the Item** in accordance with the terms of any written overdraft protection plan that you and the Bank have established.
>
> **Pay the Item** and create an overdraft to your Account.
>
> **Return the Item**. The bank may return the Item . . . if the Item would create an Overdraft on your Account.

2

1   At pages 23 and 49 of the documents are the following (emphasis added):

2   > **When a Transaction is Posted**. The time required to debit or credit your Account after the Card is used will depend on the location of the ATM or [merchant] and the type of transaction.

>                    *          *          *

> **Order of Posting**. The Bank may post items presented against the Account in any order the Bank chooses, *unless the laws governing your Account either requires or prohibits a particular order*. For example, the Bank *may*, if it chooses, post items in the order of the highest dollar amount to the lowest dollar amount. The Bank may change the order of posting items to the Account at any time without notice. If more than one item is presented to the Bank for payment on a day the Bank determines there are sufficient funds to pay one or more but not all of the items, the number of items paid and the overdraft and returned item fees assessed may be affected by the order the Bank chooses to pay those items. . . . For example, if the Bank pays items in the order of highest to lowest dollar amount, the total number of overdraft and returned item fees you are charged may be larger than if the bank were to pay the items in the order of lowest to highest dollar amount.

Customers were also given the fee schedule for bank services (including overdraft fees) when they signed up for an account.

                    *          *          *

Plaintiffs Veronica Gutierrez, William Smith, and Erin Walker were Wells Fargo customers. Gutierrez opened a checking account in October 2002 when she was eighteen. She also opened a savings account for overdraft protection. According to Gutierrez, she would regularly check her statements to make sure they were in line with her own records of her transactions, but she had difficulty because her records often did not match the balance given to her by Wells Fargo. She also frequently checked her available-balance information online, at local branch stores, or when she withdrew money at an ATM. For four years, she maintained her account without incurring any overdraft fees. On October 5, 2006, her available balance indicated she had more than $300. That same day, she made five debit card purchases totaling $87.79. Each of these transactions were authorized by Wells Fargo. She then made three debit card purchases totaling $58.61 on October 6, leaving her with a balance of over $100. She then accidently put her account into the negative when a check she had written and forgotten was processed. According to Gutierrez, instead of charging her one overdraft fee, which she

3

conceded should have been charged, Wells Fargo took all the debit transactions that had taken place between October 5–10 (which had already been authorized) and reordered them from their original chronological order to a new order of *highest* charges to *lowest* charges. *By doing this, Gutierrez contends Wells Fargo was able to assess four overdraft charges when only a single overdraft had actually occurred.* Gutierrez does not have a specific recollection of checking her available-balance information between October 5–10, but she claims it was her regular practice to do so and that she was likely to have thought the debit transactions during that time-frame were within her available account balance. *Wells Fargo virtually acknowledges that its practice is to post items after they finally settle in a sequence that will maximize overdrafts and thereby penalize customers the most.* In any event, a jury could reasonably so conclude.

Turning to the other challenged practice, William Smith was a Wells Fargo customer since the early 1990s. He had five separate accounts for both his business and his individual needs. The account in question here was opened in 1999. After he enrolled in online banking, Smith maintains that he monitored his available-balance information online daily. On July 3, 2007, Smith contends his available balance was shown as roughly $300.00. He then spent $68.65 on fireworks using his debit card. The transaction, according to Smith, was posted shortly thereafter as a pending transaction online and deducted from his available balance. He then checked his available balance online on July 12 and noted that he had about $50. At the time, he thought that all of his debit card transactions had already posted to his account and were accurately reflected in his available-balance information. He then purchased groceries for $24.76. Smith was unaware that although the fireworks purchase had initially been subtracted from his on-line balance, Wells Fargo effectively reversed it out after a few days, causing the balance to appear artificially high in light of the fact that Wells Fargo paid the fireworks charge when it was presented for payment. Put differently, Smith contends that the fireworks transaction was initially taken into account in adjusting his available balance online and then later reversed out and then ultimately subtracted again when it was presented for payment. He was then charged two overdraft charges: one for the groceries charge and one for the fireworks charge.

4

Significantly, Wells Fargo does not disclose the including-and-deleting practice to its customers. Smith claims that had he known the fireworks transaction was no longer reflected in his available-balance information he would have transferred additional funds into his account to ensure that he had sufficient funds for his groceries purchase.

Plaintiff Erin Walker opened her account with Wells Fargo when she was seventeen. After receiving several account statements and finding the information contained therein confusing, Walker began using the available-balance information shown online. She would also regularly check her available balance after withdrawing money from an ATM. She would then mentally deduct her debit transactions from her available balance to make sure she had sufficient funds for transactions. On May 29, 2007, Walker made a purchase using her debit card which she thought was within her available-balance information as of that date. She then made several more debit card transactions over the next week, each of which was approved by Wells Fargo. On June 5, Walker was charged eight overdraft fees (each $34) for all debit transactions occurring from May 29 to June 4. On Walker's account statement, the transactions for that period are all listed as occurring on June 4 from the highest amount to the lowest amount (as opposed to chronological order).

Smith and Walker testified that they did not read any of the detailed disclosures contained in the consumer account agreement discussed above or the definition for available balance published online. Gutierrez testified to having only read the available-balance definition online and other non-pertinent sections of the consumer account agreement.

\* \* \*

In an order dated September 11, 2008, two classes were certified (Dkt. 98):

> The "re-sequencing" class was defined as "all Wells Fargo customers from November 15, 2004 to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's practice of sequencing transactions from highest to lowest."

\* \* \*

> The "including and deleting" class was defined as "all Wells Fargo California customers with consumer checking accounts from November 15, 2004 to June 30, 2008, who incurred

5

> overdraft fees on debit card transactions after dissemination by Wells Fargo of available-balance information that once reflected and later deleted a debit card transaction."

The class order also denied a motion for summary judgment filed by Wells Fargo and determined that the action was not preempted.

Now that expert reports have been exchanged and fact discovery has closed, Wells Fargo moves for summary judgment on all of plaintiffs' claims.

## ANALYSIS

### 1. RE-SEQUENCING ITEMS FROM HIGHEST TO LOWEST.

The re-sequencing class challenges the order in which Wells Fargo posts debit card transactions under Section 17200 as well as other state laws. Wells Fargo argues that its posting practice is consistent with state law. Specifically, Wells Fargo contends that the Uniform Commercial Code provision on the order of posting to bank checking accounts, which California has adopted, authorizes banks to post checking and debit card transactions in any order. That UCC provision says that "items may be accepted, paid, certified, or charged to the account of [the] customer in any order." Cal. Com. Code § 4303(b).[1]

Wells Fargo concedes that Section 4303(b) does not apply to debit card transactions (Br. at 6). Nonetheless, Wells Fargo maintains the provision should be extended to also apply to debit card transactions because the exclusion was merely due to the UCC drafters' belief that such transactions were governed exclusively by federal law, including the Electronic Fund

---

[1] Another provision states "[i]f a receiving bank has received more than one payment order of the sender or one or more payment orders and other items that are payable from the sender's account, the bank may charge the sender's account with respect to the various orders and items in any sequence." Cal. Com. Code § 11504(a). This provision does not change the analysis. Even assuming it allows a bank to post in any order, it does not change the fact that the bank is subject to the duty of good faith and fair dealing.

6

Transfer Act. It follows then, according to Wells Fargo, that because California law allows a bank to post in any order, then that choice is not unfair or unlawful under Section 17200.[2]

This order holds that Section 4303(b) does *not* permit the bank to post checks, much less debit card transactions, in any order it wishes. Preliminarily, Section 4303(b) addresses the relationship between the bank and the presenters of items rather than the relationship between the bank and its depositors. Put differently, it regulates the rights as between the bank and holders of various checks and the sequence in which checks may be honored when simultaneously presented, which is especially important to those presenters when there are insufficient funds. Section 4303(b) is not directed at defining the bank-depositor relationship.

Aside from that preliminary observation, there is a more fundamental showstopper to the bank's argument. When California adopted the UCC provision in 1963, the Legislative Comment included a most telling statement:

> The only restraint on the discretion given to the payor bank under subsection (b) is that the bank act in good faith. *For example, the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer.*

Cal. Com. Code § 4303(b), Calif. cmt. 7 (emphasis added). While Wells Fargo acknowledges this limitation, the bank contends that it has not selected the posting sequence that would absolutely maximize overdraft fees because there are other possible posting sequences that

---

[2] The UCC drafters excluded transactions initiated by means of a credit card or similar device. When discussing what transactions are covered by the Electronic Fund Transfer Act of 1978, 15 U.S.C. 1693 *et seq.*, a UCC drafter stated:

> They are a variety of transactions — point of sale transactions, for example, where you put a debit card in a terminal at the grocery store and you get an instant debit to your checking account at the bank. It covers transactions in automated teller machines. . . .
>
>                  \*        \*        \*
>
> They are a variety of transactions which are described in that act. They're all consumer transactions. We have simply taken the position that in anything that is covered by federal law, we are preempted anyway, and we simply say: If it's covered in that act, then it is simply not covered here.

Transcript of Proceedings, National Conference of Commissioners on Uniform State Laws, UCC Arts. 3, 4, & 4A, at 141:16–142:8.

would result in even more overdrafts than the current posting order used. Wells Fargo further contends that the decision to use the current posting order was due to multiple considerations, including to accommodate situations where customers would want their larger and more important items to be posted first to ensure payment. On the other hand, plaintiffs assert that the bank's documents reveal that profit was the motivation for the challenged posting order and point to bank documents from which a jury could reasonably conclude that profit maximization was the true motive. This is a material question of fact that defeats summary judgment on this point.[3]

Before the UCC was adopted by California, its civil law already governed the relationship between a bank and a customer. Significantly, this body of law remains side by side with the UCC today. One of the leading decisions is *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985), which makes this point clear. Among other rules concerning bank accounts, *Perdue* held that "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise the discretion in good faith and in accordance with fair dealing." 38 Cal. 3d at 923. Applying that rule here, even if the bank-depositor contract confers discretion on the bank as to the sequence of honoring presentments, the bank must exercise its discretion in accordance with fair dealing and cannot exercise its discretion to enrich itself by gouging the consumer. Put differently, even if the bank-depositor contract purports to allow the bank to post in any order it wishes, such discretion remains subject to the bank's duty of good faith and fair dealing. There is a duty of good faith and fair dealing to honor checks in such a way as to be fair to the consumer and that discretionary power cannot be exercised so as to pile on ever greater penalties on the depositor, which is exactly what Wells Fargo seems to be doing, or so a reasonable jury could conclude.[4]

This alternative holding, under *Perdue*, is fully consistent with the statement by the California legislature condemning the very practice at issue (or close enough), saying that "the

---

[3] For example, plaintiffs cite a document entitled "OD/NSF System Enhancement Time line" that shows the bank expected $40 million from "sort order/processing changes" (Opp. Exh. 7)

[4] Unless otherwise indicated, internal citations and quotations are omitted from all quoted authorities.

8

bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer." Cal. Com. Code § 4303(b), Calif. cmt. 7.

Based on the factual record, a jury could conclude that Wells Fargo abused its discretion and has an adopted policy of maximizing the number of returned checks or transactions for the sole purpose of maximizing overdraft charges. While there is evidence, if credited, that might show a more benign motive, all inferences must be taken in favor of the party opposing summary judgment.

Furthermore, the bank's re-sequencing practice may be challenged under Section 17200. There are three alternative prongs that support finding a violation of Section 17200: (1) unlawful, (2) unfair, or (3) fraudulent. The prong at play here is the unfair prong. This order holds that a contract claim for breach of the covenant of good faith and fair dealing falls within the unfair prong of Section 17200, at least based on the allegations of this case. Where a bank has discretion under its agreement and that discretion is used to gouge consumers in violation of the covenant of good faith and fair dealing, then the unfair prong of Section 17200 applies. This unfairness is tethered to the legislative comment expressed under Section 4303(b). The tethering requirement of *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 185–86 (1999), is satisfied.

To determine whether a practice was unfair under Section 17200, earlier cases employed a balancing test that required a balancing of the harms to the consumer against the utility of the defendant's practice. *Cel-Tech* instead required that an unfair policy within the meaning of Section 17200 be tethered to a legislatively declared policy or a showing of an actual or threatened impact on competition:

> To guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or

9

> spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Id.* at 186–87.

In this case, the allegation is that the bank violated the covenant of good faith and fair dealing in abusing its discretion so as to maximize (or virtually maximize) its penalty charges by using posting transactions from highest to lowest. This practice, which is challenged as unfair, is tethered to a legislative comment addressing re-sequencing and requiring that the bank act in good faith. A jury could reasonably find that the bank's practice of re-sequencing from highest to lowest was not in good faith. This order holds this is sufficient for a claim under the unfair prong of Section 17200.[5]

In sum, Wells Fargo's motion to dismiss plaintiffs' Section 17200 claim on this basis is **DENIED**.

### 2. CONSENT REGARDING POSTING ORDER.

Wells Fargo argues that plaintiffs' non-misrepresentation claims regarding the posting order are barred by their contract — *i.e.*, the consumer account agreement — with the bank. According to Wells Fargo, the agreement provides that use of the account constitutes consent to the terms of the agreement and, thus, plaintiffs have consented to the order of posting. At page 23 of the lengthy consumer account agreement, it is stated (Zimmerman Exh. A at 23) (emphasis added):

> **Order of Posting.** The Bank may post Items presented against the Account in any order the Bank chooses, unless the laws governing your Account either requires or prohibits a particular order. For example, the Bank *may*, if it chooses, post Items in the order of the highest dollar amount to the lowest dollar amount. The Bank may Change the order of posting Items to the Account at any time without notice. If more than one item is presented to the Bank for payment . . . the overdraft and returned Item fees assess may be

---

[5] This order recognizes that California law separately recognizes a *tort* of breach of the covenant of good faith and fair dealing, which has been generally confined to insurance cases. *See Freeman & Mills v. Belcher Oil Co.*, 11 Cal. 4th 85, 102 (1995). The immediate case does not involve a tort claim but rather a contract claim, with the main difference being that punitive damages are not available for a contract claim. Other decisions in this district also have held that the unfair prong of Section 17200 extends to claims of breach of the covenant of good faith and fair dealing. *See, e.g., Gabana Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc.*, 2008 U.S. Dist. LEXIS 1658, *28 (N.D. Cal. Jan. 9, 2008); *In re HP Inkjet Printer Litig.*, 2006 U.S. Dist. LEXIS 12848, *21 (N.D. Cal. Mar. 7, 2006).

10

> affected by the order that the bank chooses to pay those Items. . . .
> For example, if the Bank pays Items in the order of highest to lowest dollar amount the total number of overdraft and returned Item fees you are charged may be larger than if the bank were to pay the Items in the order of lowest to highest dollar amount.

This language does nothing more than give discretion to the bank and once, again, that measure of discretion must be exercised subject to good faith and fair dealing and not so as to maximize bank revenue and to penalize customers as much as possible. Based on the above quoted language, this order is unwilling to conclude that plaintiffs consented to the order of posting at issue. As the class order herein stated (Dkt. 98 at 15):

> The disclosure quoted above is arguably inadequate. It is buried deep within the lengthy statement. It only says the bank *might* post items presented against the account in any order the bank chooses (unless the law requires otherwise). It uses the word "may" rather than "will," leading the customers to believe, in the context of the statement, that reordering is not automatic but merely an exception — whereas reordering is a secret daily routine aimed solely at maximizing penalty revenue for the bank at the expense of the customer.

Wells Fargo argues that it could not use the word "will" because it would be inaccurate when in some instances a customer's transactions will be posted from high-to-low and in others it will not. That the agreement uses the word "may" in the permissive sense or could not use the word "will" does not make the disclosure any clearer or make it suddenly become a full and express disclosure. The agreements shrouds the bank's practice in vaguely worded mumbo jumbo. This order is unwilling to conclude that plaintiffs consented to the posting order on the basis of this disclosure. And, the fact remains that under California law the discretion that is conferred for sequencing must be exercised in good faith and specifically may not be exercised so as to increase penalty revenue.

**3. WAIVER AND VOLUNTARY PAYMENT.**

Next, arguing that plaintiffs incurred and voluntarily paid the overdraft fees in an ongoing contractual relationship, Wells Fargo relies on defenses of waiver and voluntary payment to assert that plaintiffs' claims are barred. Wells Fargo argues that, under *Lopez v. Washington Mutual Bank, F.A.*, 302 F.3d 900, 904 (9th Cir. 2002), plaintiffs consented explicitly to the bank's actions under the account agreement and then consented implicitly by failing to close their accounts after

11

the disputed overdrafts occurred. In *Lopez*, the plaintiffs voluntarily opened an account and executed an agreement which outlined the terms and conditions of the bank's overdraft policies. 302 F.3d at 904. The plaintiffs there also set up a direct deposit of their Social Security benefits to their accounts (through an agreement to which the bank was not a party), and they remained free to close their accounts or change their direct-deposit instructions. Plus, two of the named plaintiffs indicated that they understood the bank's overdraft policies. Accordingly, the Ninth Circuit treated the plaintiffs' deposits to their accounts after an overdraft as a voluntary payment of a debt incurred.

In contrast, this order, as stated above, does not reach the conclusion that plaintiffs explicitly consented based on an arguably inadequate disclosure regarding the challenged re-sequencing practice in the consumer account agreement. Likewise, this order does not find that plaintiffs explicitly consented in the complete absence of a disclosure regarding the challenged including-and-deleting practice. Also, the class claims are based in fraud, so even if plaintiffs paid the overdraft fees, the bank has been accused of concealing material facts from them. Unlike the plaintiffs in *Lopez*, the current record does not support a finding that the plaintiffs understood Wells Fargo's overdraft policies. This order is unwilling to find that plaintiffs' claims are barred by waiver and voluntary payment.

Relying on waiver and a voluntary-payment theory, Wells Fargo also attacks plaintiffs Gutierrez, Smith, and Walker's individual claims. According to Wells Fargo, Smith and Gutierrez transferred funds into their accounts to cover overdraft fees and they did not close their bank accounts. As generally discussed above, this order will not conclude that waiver or voluntary payment prevent plaintiffs from proceeding with their claims on these facts, particularly in the absence of a clear showing of consent.

As to Walker, the bank assessed eight overdraft charges on June 4 and 5, 2007. Over a month later, Walker went to the bank and the bank agreed to forgive four of her overdraft fees. In turn, Walker paid the outstanding overdraft balance and remaining fees. She continued to use her account until she closed it in December 2007. While some of Walker's fees were waived and she paid others, there is still an open question as to whether she consented, because the record

12

does not show that Walker was aware of the precise parameters that led to the challenged practices. And, albeit months later, she did close her account.

In conclusion, Wells Fargo's motion for summary judgment as to waiver and voluntary payment is **DENIED**.

### 4. CONVERSION.

The elements of a conversion claim include plaintiff's ownership or right to possession of property; defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession; and damage to plaintiff. *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (1998).

Wells Fargo asserts that neither class can proceed with a conversion claim. This order agrees. *First*, plaintiffs have not demonstrated their ownership or right to possession of the property. The relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor. A bank may not be sued for conversion of funds deposited with the bank. "Therefore, when funds are deposited, title to those funds passes immediately to the bank. Since the money thus becomes the literal property of the bank, it cannot be tortiously converted by the bank." *See Crocker-Citizens Nat'l Bank v. Control Metals Corp.*, 566 F.2d 631, 637–38 (9th Cir. 1978). *Second*, plaintiffs cite no California authority to support the proposition that a conversion claim may be based on an overcharge. Essentially, plaintiffs challenge Wells Fargo practices that lead to it taking excessive overdraft fees from their accounts or, in other words, they complain about overcharging. As such, they fail to state a claim of conversion. *See McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1491–92 (2006). Accordingly, Wells Fargo's motion for summary judgment as to the conversion claim is **GRANTED**.

### 5. CLRA.

Plaintiffs allege that defendants' practices of re-sequencing and including-and-deleting lead to the assessment of excessive overdrafts and overdraft fees. The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful." Cal. Civ. Code § 1770.

13

Wells Fargo argues that this statute does not apply to the bank's activities in covering overdrafts and charging overdraft fees. In support, Wells Fargo points to the statute's legislative history. An early draft of Section 1761 "defined 'Consumer' as 'an individual who seeks or acquires, by purchase or lease, any goods, services, money, or credit for personal, family or household purposes.'" *See Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224, 230 (2007) (quoting Assem. B. No. 292, 1970 Reg. Sess. (Cal Jan. 21, 1970)). References to "money" and "credit" were removed before the CLRA's enactment. *Ibid.* Several decisions have relied on this legislative history in holding that the CLRA does not apply to the extension of lines of credit through credit cards, separate and apart from the sale of goods or services. *See, e.g., ibid.*; *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1358 (N.D. Cal. 2007).

Wells Fargo seeks to apply the same logic here. The bank argues that the CLRA does not apply to overdrafts and overdraft fees. Wells Fargo concedes that covering an overdraft is not technically providing "credit" to a customer but maintains that it constitutes making "money" available to pay the customer's transactions (Br. at 19). Then, money is provided "separate and apart from any sale or lease of goods or services."

To argue against this, plaintiffs cite to *Hernandez v. Hilltop Fin. Mortgage, Inc.*, 2007 WL 3101250, *6 (N.D. Cal. Oct. 22, 2007) and *Jefferson v. Chase Home Finance LLC*, 2007 WL 1302984, *3 (N.D. Cal. May 3, 2007). Those decisions are not on point. In both cases, the plaintiff's claims were directed at the defendant's prepaid mortgage practices, and the decisions held that the CLRA applied to financial services connected with mortgages. For example, the court in *Hernandez* concluded that the CLRA was applicable because the defendants' actions, advising the plaintiffs and managing their loan, constituted "services."

The California Supreme Court has not addressed the question of whether overdrafts and overdraft fees fall within the CLRA's definition of a "good" or a "service." The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not they are severable from the real property"; it defines

"services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1661. Plaintiffs have not identified the purported good or service here. Indeed, plaintiffs likely bought goods and services in many instances with the money extended because of overdrafts. But not from the bank. Much like credit cards provide an extension of credit, an overdraft provides an extension of money. Plaintiffs cite no authority showing that the bank's action was undertaken "in a transaction intended to result or which results in the sale or lease of *goods or services*." Cal. Civ. Code § 1770 (emphasis added). Accordingly, Wells Fargo's motion for summary judgment as to the CLRA claim is **GRANTED**.

### 6. REMAINING SECTION 17200, SECTION 17500, FRAUD, AND NEGLIGENT MISREPRESENTATION CLAIMS.

Wells Fargo summarily argues that summary judgment should be granted as to the remaining Section 17200, Section 17500, fraud, and negligent misrepresentation claims of the re-sequencing class because the only viable basis for these claims are misrepresentations. Wells Fargo previously filed a motion for partial summary judgment asserting that plaintiffs could not prove reliance on any misrepresentations. The Court has since determined that Gutierrez's claims, for example, could proceed on the basis of some of the misrepresentations, including the welcome jacket and consumer account agreement.

Wells Fargo also argues that summary judgment should be granted as to the remaining Section 17200, Section 17500, fraud, and negligent misrepresentation claims asserted by the including-and-deleting class. Wells Fargo argues that individual plaintiffs Walker and Smith have no evidence of actual injury. The class order previously addressed these arguments (Dkt. 98 at 19, 20). Wells Fargo acknowledges as much, stating: "The Court previously found there to be a disputed issue of fact as to whether Walker relied on an available balance that was affected by including and deleting" and "[t]he Court has also previously found sufficient evidence that Smith relied on a balance that was affected by including and deleting" (Br. at 14–15). Nothing new has been presented that warrants reconsideration of the prior order herein addressing these issues.

As such, Wells Fargo's motion on these bases is **DENIED**.

15

### 7. FRAUDULENT INTENT.

According to Wells Fargo, there is no evidence of fraudulent intent and hence plaintiffs cannot prove their fraud claims. This order rejects defendant's argument. A determination of fraudulent intent is a fact question that goes to the defendant's state of mind. "[T]he only intent by a defendant necessary to prove a case of fraud is the intent to *induce reliance.* Moreover, liability is affixed not only where the plaintiff's reliance is *intended* by the defendant but also where it is *reasonably expected* to occur." *See Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 93–94 (2001). Plaintiffs point to evidence that Wells Fargo decided not to inform customers of the change in posting practices and that there is no formal policy to disclose to customers the challenged including-and-deleting practice. Arguably, defendant not only intended to induce reliance but it also reasonably expected it to occur by not fully disclosing its practices. Viewing the evidence in the light most favorable to plaintiffs as the nonmoving party, as this order must on a motion for summary judgment, a jury could reasonably find that fraudulent intent exists. Wells Fargo's motion for summary judgment as to fraudulent intent is **DENIED**.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: May 5, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE